## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUIS HERMAN, III, derivatively on behalf of WARNER BROS. DISCOVERY, INC., <br><br> Plaintiff, <br><br> v. <br><br> LI HASLETT CHEN, SAMUEL A. DI PIAZZA, JR., RICHARD W. FISHER, PAUL A. GOULD, DEBRA L. LEE, KENNETH W. LOWE, JOHN C. MALONE, FAZAL MERCHANT, PAULA A. PRICE, GUNNAR WIEDENFELS, GEOFFREY Y. YANG, and DAVID ZASLAV, <br><br> Defendants, <br><br> and <br><br> WARNER BROS. DISCOVERY, INC., <br><br> Nominal Defendant. | Case No.: <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Louis Herman, III ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Warner Bros. Discovery, Inc. ("WBD" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants (defined below) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by WBD with the United States Securities and Exchange Commission (the "SEC"); (ii) press releases issued and disseminated by WBD; (iii) court submissions in a securities class action captioned *Collura v. Warner Bros. Discovery, Inc. et al.*, Case No. 1:24-cv-

09027 (the "Securities Class Action") against the Company and its chief financial officer ("CFO") and chief executive officer ("CEO"), both of whom are members of the Company's Board of Directors (the "Board"); and (iv) other publicly available information concerning WBD.

## NATURE OF THE ACTION

1.    This is a shareholder derivative action brought in the right, and for the benefit, of WBD against certain of its officers and directors seeking to remedy their violations of law that have occurred from February 23, 2024 through August 7, 2024 (the "Relevant Period") and have caused, and continue to cause, substantial harm to WBD and its shareholders, including monetary losses and damages to WBD's reputation and goodwill.

2.    This action arises from WBD's materially false and misleading statements concerning its business prospects, particularly regarding its crucial media rights negotiations with the National Basketball Association ("NBA") and the financial health of its Networks Segment. WBD, as a global media and entertainment company, has historically relied heavily on basketball programming through its TNT network to drive ratings and revenue since 1988.

3.    Under its 2014 agreement with the NBA, TNT paid an annual average fee of $1.2 billion for broadcast rights.  However, in 2024, when the NBA entered advanced discussions for a new round of media rights deals, WBD failed to secure a new agreement during its exclusive negotiating window, which expired in April 2024.  This failure allowed competitors to enter the bidding process, with NBC offering $2.5 billion annually and Amazon offering $1.8 billion annually for the rights.

4.    Throughout the Relevant Period, WBD's management made materially false and misleading statements by failing to disclose several critical facts.  First, they concealed that the ongoing NBA media rights negotiations were compelling, or were reasonably likely to compel, WBD to undertake a substantial reassessment of its business operations and goodwill valuations.

Second, the Individual Defendants (defined below) withheld from investors that the Networks segment's goodwill had experienced significant deterioration due to multiple factors: the substantial gap between the Company's market capitalization and book value, ongoing weakness across U.S. advertising markets, and mounting uncertainty surrounding both affiliate relationships and sports rights renewals, particularly concerning the NBA contract. Third, these undisclosed conditions substantially elevated the probability that WBD would need to record goodwill impairment charges amounting to billions of dollars. Fourth, as a direct consequence of these concealed circumstances, the Individual Defendants presented an artificially inflated and misleading picture of WBD's business outlook and financial health. Consequently, the Individual Defendants caused WBD to issue public statements that were materially false and misleading throughout the Relevant Period.

5.    The truth emerged on August 7, 2024, when WBD released its second quarter 2024 financial results. The Company reported disappointing revenue of $9.71 billion, representing a 6.3% year-over-year decline and missing consensus estimates by $360 million. More significantly, WBD reported a staggering net loss of approximately $10 billion, primarily attributed to a $9.1 billion non-cash goodwill impairment charge from its Networks segment and $2.1 billion in other one-time accounting effects. The Company explicitly attributed the goodwill impairment to the gap between market capitalization and book value, ongoing weakness in the U.S. linear advertising market, and uncertainty surrounding affiliate and sports rights renewals, specifically mentioning the NBA negotiations.

6.    On this news, WBD's stock price dropped $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

7.    As a result of the foregoing, WBD, its CEO, and CFO have been named as defendants in the Securities Class Action by investors who allege they were damaged when they purchased WBD shares at inflated prices during the Relevant Period.

8.    The Securities Action has subjected the Company to losses from the waste of corporate assets and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company.  The Individual Defendants' wrongful conduct will likely cost the Company millions of dollars going forward..

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Securities Exchange Act and SEC Rule 10b-5 promulgated thereunder, as well as Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy.  This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.    This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.  The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in this state and has consented to service in this state.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and violation of fiduciary duties owed to WBD.

Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant WBD could have sued the same Defendants in this District.

## PARTIES

12.    Plaintiff is a WBD stockholder and has continuously held WBD stock from the time of the wrongdoing alleged herein until the present.  Plaintiff will fairly and adequately represent WBD's interest in this action.

13.    Nominal Defendant WBD is incorporated under the laws of Delaware, and its principal executive offices are located at 230 Park Avenue South, New York, New York 10003. WBD's common stock trades on the Nasdaq exchange under the symbol "WBD."

14.    Defendant Samuel Di Piazza ("Di Piazza") has served as a member of the Board since 2022 and has been a member of its Audit Committee at least since April 2024.  For the Company's fiscal year 2023, Di Piazza received $534,207 in compensation.

15.    Defendant Li Haslett Chen ("Chen") has served as a member of the Board since 2022.  For the Company's fiscal year 2023, Chen received $354,186 in compensation.

16.    Defendant Richard Fisher ("Fisher") has served as a member of the Board since 2022.  For the Company's fiscal year 2023, Fisher received $379,186 in compensation.

17.    Defendant Paul Gould ("Gould") has served as a member of the Company's Board since 2008.  For the Company's fiscal year 2023, Gould received $389,186 in compensation.

18.    Defendant Debra Lee ("Lee") has served as a member of the Company's Board since 2022.  For the Company's fiscal year 2023, Lee received $359,186 in compensation.

19.    Defendant Kenneth Lowe ("Lowe") served as a member of the Company's Board from 2018 to 2022, and again beginning in 2023.  He has served as a member of the Company's Audit Committee since at least April 2024.  For the Company's fiscal year 2023, Lowe received $342,936 in compensation.

20.    Defendant John Malone ("Malone") has served as a member of the Company's Board since 2008.    For the Company's fiscal year 2023, Malone received $361,686 in compensation.

21.    Defendant Fazal Merchant ("Merchant") has served as a member of the Company's Board since 2022.  He has served as a member of the Audit Committee since at least March 2023. For the Company's fiscal year 2023, Merchant received $374,222 in compensation.

22.    Defendant Paula Price ("Price") has served as a member of the Company's Board since 2022.  She has served as Chair of the Audit Committee since at least March 2023.  For the Company's fiscal year 2023, Price received $399,186 in compensation.

23.    Defendant Geoffrey Yang ("Yang") has served as a member of the Company's Board since 2022.  For the Company's fiscal year 2023, Yang received $364,198 in compensation.

24.    Defendant Gunnar Wiedenfels ("Wiedenfels") has served as the Company's CFO since 2022, after previously having served as the CFO of Discovery, Inc. ("Discovery").  For the Company's fiscal year 2023, Wiedenfels received over $17 million in compensation.  He is a named defendant in the Securities Class Action.

25.    Defendant David Zaslav ("Zaslav") has served as a member of the Board since 2008 and as the Company's President and CEO since 2022.  He previously served as President of Discovery from 2006 to 2022.  For the Company's fiscal year 2023, Defendant Zaslav received over $49.7 million in compensation.  He is a named defendant in the Securities Class Action.

26.    The following Defendants are collectively referenced herein as the "Individual Defendants": Di Piazza, Chen, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Yang, Wiedenfels, and Zaslav.

27.    The following Individual Defendants are collectively referenced herein as the "Director Defendants": Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Yang, and Zaslav.

28.    The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Di Piazza, Lowe, Merchant, and Price.

29.    The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Wiedenfels and Zaslav.

30.    The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

31.    At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in WBD.

32.    Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed and owe the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

33.    The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

34.    Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good

faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

35.    Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

36.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of WBD were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry

into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

37.    The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

38.    Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by WBD.

39.    The Board has adopted WBD's Code of Ethics to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants.

40.    The Code of Ethics "provides the standards for: ensuring compliance with applicable laws, regulations and Company policies; promoting integrity and the highest standards of ethical conduct; and helping us avoid even the appearance of anything improper in our business activities."

41.    The Code of Ethics "applies to all directors, officers, and employees of [WBD]." Among the duties and responsibilities imposed on the Individual Defendants are the following:

- Act with integrity, especially when making difficult decisions;

- Familiarize yourself with the Code and the laws applicable to you, your job responsibilities, and your location;

- Familiarize yourself with the Company's Ethics & Compliance policies, which supplement and contain additional requirements for the topics covered in the Code;

- Complete required training and other Company initiatives in a timely manner;

- Keep up-to-date on Company standards and expectations;

- Seek guidance whenever you encounter a situation where how to "do the right thing" is unclear;

- Promptly report concerns about conduct that may be inconsistent with the Code, our policies or the law—do not undertake an investigation on your own;

- Cooperate and tell the truth when participating in an investigation, audit or other inquiry.

\*      \*      \*

## Complying with Laws and Regulations

Complying with the law is the minimum standard for ethical conduct and we are committed to full compliance with all laws and regulations that apply to our business. It is, however, impossible to anticipate every situation that might arise in the course of your day-to-day business activities. Therefore, the Code includes additional resources that are available to you as questions arise. As an employee, it is up to you to use good judgment and to seek help when necessary.

\*      \*      \*

## Integrity of Financial Records and Public Disclosure

Our financial records serve as a basis for managing our business and fulfilling our responsibilities to shareholders, our employees and other stakeholders. The integrity of our financial records is also important to our compliance with accounting, tax and public disclosure laws and regulations and other requirements.

We are committed to maintaining accurate and complete financial records and to full, fair, accurate, timely and understandable disclosure in reports and documents that are filed with the U.S. Securities and Exchange Commission and other regulatory bodies or are otherwise made publicly available.

Individually, we are all responsible for recording clear, accurate and honest information in all Company records that we produce, such as expense reports, financial statements and public disclosure documents.

\*      \*      \*

## Examples of questionable accounting/audit matters include:

- Fraud or deliberate error in the preparation or audit of any financial statement or record.

- Deficiencies or noncompliance with the Company's internal accounting controls.

- Misrepresentations or false statements contained in Company's financial or audit records or reports.

- Other deviation from full and fair reporting of the Company's financial condition.

42.     The Company has also adopted Corporate Governance Guidelines (the "Corporate Guidelines").  The Corporate Guidelines were adopted by the Board "to assist the Board in the exercise of its duties and responsibilities and to serve the best interests of the Company and its stockholders."  Specifically, the Corporate Guidelines describe the roles and responsibilities of management and the Board as follows:

1.     ROLES OF MANAGEMENT AND THE BOARD

The Company's officers and employees, under the direction of its Chief Executive Officer ("CEO") and the oversight of the Board, conduct the Company's business with the goal of enhancing the long-term value of the Company for the benefit of its stockholders.  The Board is elected by the stockholders to oversee the management of the Company and to help assure that the interests of the stockholders are served.

\*     \*     \*

3.     DIRECTOR RESPONSIBILITIES

a)     <u>Oversee Management of the Company</u>.  The Board believes that the primary responsibilities of directors are to exercise their business judgment in good faith, to act in what they reasonably believe to be the best interest of all stockholders, and to ensure that the business of the Company is conducted so as to further the long-term interests of its stockholders.  The Company's business and affairs are managed under the Board's direction rather than managed by the Board. The Board performs its oversight function in a manner that respects the distinct roles of the Board and management so as not to disrupt the Company's day-to-day operations.

\*     \*     \*

4.     CONFLICTS OF INTEREST

    a)    <u>Ethics and Conflicts of Interest</u>.  The Company has adopted a Code of Ethics (the "Code") that is applicable to all of its directors, officers and employees.  Directors are expected to be familiar with and to adhere to the Code, including, for example, its provisions governing conflicts of interest.  If a director has an actual or potential conflict of interest (which includes being a party to a proposed "related person transaction"), the director should promptly inform the CEO, the General Counsel and the Chair of the Nominating and Corporate Governance Committee.   Directors should recuse themselves from any decision by the Board or a Board committee that involves or affects their personal, business or professional interests.  The Nominating and Corporate Governance Committee or such other independent committee of the Board designated by the Board will resolve any conflict of interest issue involving a director or the CEO or any other executive officer of the Company.  No related person transaction may be effected by the Company without the approval of the Nominating and Corporate Governance Committee or such other independent committee of the Board designated by the Board to resolve the conflict of interest.  For purposes of these Guidelines, a "related person transaction" refers to any transaction which the Company would be required to disclose pursuant to Item 404 of Regulation S-K.

43.     The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Di Piazza, Lowe, Merchant, and Price during the Relevant Period.

44.     Pursuant to the Audit Charter, the purpose of the Audit Committee "is to provide assistance to the Board in fulfilling the Board's responsibilities to the Company and its stockholders relating to the accounting, financial reporting process, internal controls and the audit of the Company's financial statements."

45.     The Audit Charter states that the Audit Committee "will generally oversee management's processes and activities relating to: maintaining the reliability and integrity of the Company's accounting policies, internal controls, financial reporting practices and financial statements . . . . the performance of the Company's internal audit function and independent auditor . . . .  [and] confirming compliance with U.S. Federal securities laws and regulations, and the

requirements of any stock exchange or quotation system on which the Company's securities may

be listed."

46.    The overarching duties of the Audit Committee and its members include the

following:

*Financial Statement and Disclosure Matters*

F.    Audited Financial Statements.  The Committee shall review and discuss
with management and the independent auditor the Company's annual
audited financial statements, including disclosures made in "Management's
Discussion and Analysis of Financial Condition and Results of Operations"
and the results of the independent auditor's review of the annual audited
financial statements, and recommend to the Board whether the audited
financial statements should be included in the Company's Form 10-K.

G.    Interim Financial Statements.  The Committee shall review and discuss with
management and the independent auditor the Company's quarterly financial
statements, including disclosures made in "Management's Discussion and
Analysis of Financial Condition and Results of Operations," prior to the
filing of the Company's Forms 10-Q, including the results of the
independent auditor's review of the quarterly financial statements.

H.    Review of Financial Disclosures.  The Committee shall review and discuss
with management and the independent auditor, as applicable, (A)
significant issues regarding accounting principles and financial statement
presentations, including any significant changes in the Company's selection
or application of accounting principles, major issues as to the adequacy of
the Company's internal controls and any special audit steps adopted in light
of material control deficiencies; (B) analyses prepared by management or
the independent auditor setting forth significant financial reporting issues
and judgments made in connection with the preparation of the financial
statements, including analyses of the effects of alternative generally
accepted accounting principles ("GAAP") methods on the financial
statements; (C) the effect of regulatory and accounting initiatives, as well
as off-balance sheet structures, on the financial statements of the Company;
(D) any other financial disclosures prior to their inclusion in the Company's
Form 10-K or Forms 10-Q to determine that management and the
independent auditor are satisfied with the disclosure and content of the
financial statements to be presented; and (E) earnings press releases prior to
their public release, including the use of non-GAAP financial measures, as
well as financial information and earnings guidance (generally or on a case-
by-case basis) provided to analysts and rating agencies.

I.    <u>Review of Independent Auditor Reports</u>.  The Committee shall, at least quarterly, review and discuss reports from the independent auditor on (A) all critical accounting policies and practices to be used;(B) all alternative treatments of financial information within GAAP that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and treatments preferred by the independent auditor; and (C) other material written communications between the independent auditor and management, such as any material or significant control recommendations or schedule of unadjusted differences.

J.    <u>Audit Committee Report</u>.  The Committee shall prepare the Audit Committee report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

*        *        *

M.    <u>Certifications</u>.  The Committee shall review disclosures made to the Committee by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10- K and Form 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Company's internal controls.

*        *        *

*Oversight of the Company's Internal Audit Function*

S.    <u>Oversight</u>.  The Committee shall oversee the activities, organizational structure, and qualifications of the internal audit function and review the appointment and replacement of the senior internal audit executive.  The internal audit function shall report functionally to the Committee and administratively to the Company's Chief Financial Officer.

T.    <u>Internal Audit Process</u>.  In connection with its oversight of the Company's internal audit process, the Committee shall:

- Discuss with the independent auditor and management the internal auditor function's responsibilities, budget and staffing and any recommendations or suggested changes in the planned scope of the internal audit function.

- Review and approve the annual internal audit plan, objectives, and schedules and review any special projects undertaken by the internal audit function.

- Advise the director of the internal audit department that he or she is expected to provide the Committee summaries of and, as appropriate,

14

the significant reports to management prepared by the internal audit department and management's responses thereto.

## SUBSTANTIVE ALLEGATIONS

**Background**

47.    WBD operates as a global media and entertainment conglomerate, delivering content, brands, and franchises across multiple platforms including television, film, streaming, and gaming.  The Company's business is structured into several reportable segments, with its Networks Segment serving as a crucial revenue driver through its portfolio of domestic and international television networks.

48.    WBD's TNT network has strategically positioned basketball programming as a cornerstone of its content strategy, particularly through its long-standing relationship with the NBA.  This partnership has been instrumental in driving both ratings and revenue for the Company's Networks Segment.  Under the terms of its 2014 agreement with the NBA, TNT committed to an annual average payment of $1.2 billion for broadcasting rights, reflecting the substantial value of this content partnership to WBD's business model.

49.    In early 2024, the NBA initiated discussions for a new round of media rights agreements, seeking to establish long-term partnerships spanning approximately ten years. Despite having an exclusive negotiating window, WBD failed to secure a renewal of its rights agreement with the NBA before this window expired in April 2024.  This failure opened the door for competing media companies to bid for these valuable sports rights, with NBC proposing an annual fee of $2.5 billion and Amazon offering $1.8 billion, both significantly higher than WBD's previous agreement.

**The Individual Defendants Issue False and Misleading Statements**

50.    Through a series of communications, the Individual Defendants breached their fiduciary duties by making or authorizing materially false and misleading statements and failing to disclose material adverse facts about the Company's business, operations, and prospects.  First, they concealed that the ongoing NBA media rights negotiations were compelling, or were reasonably likely to compel, WBD to undertake a substantial reassessment of its business operations and goodwill valuations.  Second, the Individual Defendants withheld from investors that the Networks Segment's goodwill had experienced significant deterioration due to multiple factors: the substantial gap between the Company's market capitalization and book value, ongoing weakness across U.S. advertising markets, and mounting uncertainty surrounding both affiliate relationships and sports rights renewals, particularly concerning the NBA contract.  Third, these undisclosed conditions substantially elevated the probability that WBD would need to record goodwill impairment charges amounting to billions of dollars.  Fourth, as a direct consequence of these concealed circumstances, the Individual Defendants presented an artificially inflated and misleading picture of WBD's business outlook and financial health.  Consequently, the Individual Defendants caused WBD to issue public statements that were materially false and misleading throughout the relevant period.

51.    On February 23, 2024, WBD issued a press release announcing its fourth quarter and full year 2023 financial results.  Press Release, Warner Bros. Discovery, Inc., *Warner Bros. Discovery, Inc. Reports Fourth Quarter 2023 Earnings Results* (Feb. 23, 2024) (the "February 23, 2024 PR").  The February 23, 2024 PR quoted Defendant Zaslav as saying that "[a]fter executing against our strategic plan to reposition the company, we are now on solid footing with a clear pathway to growth" and that the Company had "an attack plan for 2024 that includes the roll-out

of Max in key international markets, a more robust creative pipeline across our film and TV

studios, and further progress against our long-range financial goals and are confident in our ability

to drive sustained operating momentum and enhanced shareholder value."

52.    Under a section detailing highlights from the Company's fourth quarter 2023, the

February 23, 2024 PR stated, in relevant part:

- Networks operating expenses decreased 7% ex-FX[1] to $2,829 million compared to the prior year quarter. The AT&T SportsNet business exit favorably impacted the year-over-year growth rate by approximately 300 bps(12)[.]

    o Costs of revenues decreased 7% ex-FX, primarily driven by lower international sports rights fees, including the transfer of TNT Sports Chile, exiting the AT&T SportsNet business, as well as lower domestic general entertainment content expense, partially offset by the impact of inflation in Argentina.

    o SG&A [selling, general, and administrative] expenses decreased 4% ex-FX, primarily driven by lower personnel expenses.

53.    During the related earnings call, Defendant Zaslav assured investors that WBD's

"top priority this year was to get this company on solid footing and on a pathway to growth, and

we've done that" and that the Company had "significantly enhanced the efficiency of the

organization with a long runway still to go."  He continued:

We are optimistic that the efforts we've undertaken on digital and advanced advertising solutions, much of which you'll hear about leading up to and during the upfront, will enable us to achieve amore competitive profile.  Bottom line, we're a far healthier company now, and we're building real momentum.  And we expect 2024 will be a year to drive that momentum forward even further.  That said, this business is not without its challenges.  Among them, we continue to face the impacts of ongoing disruption in the pay-TV ecosystem and a dislocated linear advertising ecosystem.

54.    Defendant Zaslav stated as follows regarding NBA-related content:

---

[1] References to "ex-FX" in WBD's financial statements refer to the exclusion foreign exchange rate effects.

Last weekend we saw great coverage and strong ratings at the NBA All-Star Game and All-Star Weekend. We have a strong positive 40-year relationship with the NBA. And in terms of our NBA rights, we are now fully engaged in renewal discussions, and they are constructive and productive. Our global sports portfolio continues to provide real meaningful value to all of our platforms. We're proud to be the home of one of the most coveted collections of premium sports content in the industry, along with a best-in-class talent roster and exceptional production values.

55.     During the related earnings call, the following exchange occurred between an analyst and Defendant Wiedenfels:

**Analyst**—[G]reat news to hear on the NBA conversations. Clearly, that would be a big positive to retain those rights. How do you think about making that work financially for the company? It's not a big debate that linear TV is under pressure on the revenue side, and I think it's probably safe to say the NBA costs are going to group. So how do you guys approach this from a kind of a P&L point of view when you think about exploiting the NBA for what I imagine will be another long-term deal? Thanks so much.

\*          \*          \*

**Defendant Wiedenfels**—[O]n the NBA, as you know, we're in the middle of exclusive discussions here, so I want to lift it up maybe one level to a general statement on how we look at sports rights. We're spending close to $20 billion sort of, on content and programming in the broadest sense, and every dollar we spend plays a different role across the portfolio. We generally like to own our content. That's not the case with sports, but we obviously acknowledge the enormous value, reach value, emotional value of these deals. And we have been able to strike profitable deals and we're always going to be disciplined. It's very easy to lose control over sports rights investments. That's not what we do. We're going—we know exactly what value we assign and we stay disciplined during our discussions.

And if you take that into account, I think we have enormous opportunity to be much more efficient with our content spend overall across the entire company, and that will include certain areas in which, you're right, you probably have to assume that there is inflation going forward. On the NBA specifically, we've had a very, very strong partnership for 40 years, and I certainly hope that we're going to be able to continue that in the most positive way.

56.     Also, on February 23, 2024, the Company filed its 2023 annual report on Form 10-K with the SEC for the year ending December 31, 2023. Warner Bros. Discovery, Inc., *Annual Report* (Form 10-K) (Feb. 23, 2024) (the "2023 10-K"). The 2023 Form 10-K was signed by

Defendants Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Wiedenfels, Yang, and Zaslav. Attached to the 2023 10-K are certifications signed by Defendants Zaslav and Wiedenfels pursuant to the Sarbanes-Oxley Act of 2002 attesting that the information contained in the 2023 10-K "fairly presents, in all material respects, the financial condition and results of operations of Warner Bros. Discovery[,]" and that the 2023 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

57.     The 2023 10-K contained the following impairment analysis:

*2023 Impairment Analysis*

As of October 1, 2023, the Company performed a quantitative goodwill impairment assessment for all reporting units. The estimated fair value of each reporting unit exceeded its carrying value and, therefore, no impairment was recorded. . . . [T]he Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%. The fair values of the reporting units were determined using a combination of DCF [discounted cash flow] and market valuation methodologies. Due to [*inter alia*] declining levels of global GDP growth, [and] soft advertising markets in the U.S. associated with the Company's Networks reporting unit . . . the Company will continue to monitor its reporting units for changes that could impact recoverability.

58.     The 2023 10-K contained generic, boilerplate representations regarding the Company's investment of "significant resources to acquire and maintain licenses to produce sports programming" and that the Company could not make assurances of continued "successful efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed:"

**We invest significant resources to acquire and maintain licenses to produce sports programming and there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed.**

We face significant competition to acquire and maintain licenses to sports programming, which leads to significant expenditure of funds and resources. As a result of an increasing number of market entrants in the programming space, we have seen upward pressure on programming costs in recent years, particularly in connection with the licensing and acquisition of sports content from third parties. We may also be impacted by such upward pressures driven by increasing investment in programming by competitors. . . . There can be no assurance that we will be able to compete successfully in the future against existing or new competitors to obtain and/or maintain licenses to recurring sports events, or that increasing competition for programming licenses . . . will not have a material adverse effect on our business, financial condition or results of operations.

There can also be no assurance that we will recoup our investment in sports programming, including realizing any anticipated benefits of our joint ventures. The impact of these contracts on our results of operations over the term of the contracts depends on a number of factors, including the strength of advertising markets and subscription levels and rates for programming. Our success with sports programming is highly dependent on consumer acceptance of this content and the size of our viewing audience.[2]

59.     The 2023 10-K also contained generic, boilerplate representations regarding WBD's recognition of impairment charges related to goodwill:

**We have recognized, and could continue to recognize, impairment charges related to goodwill and other intangible assets**.

We have a significant amount of goodwill and other intangible assets on our consolidated balance sheet.  In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired.  Significant negative industry or economic trends, including the continued decline of traditional linear television viewership and linear ad revenues, disruptions to our business, inability to effectively integrate acquired businesses, underperformance of our content, unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and market capitalization declines ***may*** impair goodwill and other intangible assets.  Any charges relating to such impairments ***could*** materially adversely affect our results of operations in the periods recognized.

60.     These purported risk warnings were generic, catch-all provisions that were not tailored to WBD's actual known risks regarding its sports rights negotiations with the NBA nor impairments to its Networks segment's goodwill, or that the difference between its market

---

[2] All emphasis is added unless otherwise noted.

capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including the NBA, were likely to lead to billions of dollars in goodwill impairment charges.

61.     On May 9, 2024, the Company issued a press release announcing its first quarter 2024 financial results.  Press Release, Warner Bros. Discovery, Inc., *Warner Bros. Discovery, Inc. Reports First Quarter 2024 Earnings Results* (May 9, 2024) (the "May 9, 2024 PR").  The May 9, 2024 PR quoted Defendant Zaslav as saying that "[w]e are pleased with our progress in the first quarter as evidenced by strong results in important [key performance indicators]" and that WBD "continue[d] to make bold moves to transform our company for the future as we position ourselves to take full advantage of the opportunities ahead."

62.     The May 9, 2024 PR included the following highlight for WBD's first quarter of 2024:

- Networks operating expenses decreased 8% ex-FX to $3,006 million compared to the prior year quarter.  The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps(11)[.]

  o  Costs of revenues decreased 8% ex-FX, primarily driven by the AT&T SportsNet exit, the allocation of U.S. sports costs to DTC, as well as lower general entertainment content expense.  These benefits were partially offset by the timing of domestic sports rights expense, unfavorable inflationary impacts in Argentina, and higher election expenses.  The AT&T SportsNet exit favorably impacted the growth rate by approximately 300 bps.

  o  SG&A decreased 8% ex-FX, primarily driven by lower overhead expenses.

63.     During the related earnings call, Defendant Zaslav touted the Company's purported "confiden[ce] in the strength of our assets[,]" and stated that "we're more confident than ever in our assets and our playbook."

64.     During the call, Defendant Zaslav stated as follows regarding WBD's negotiations with the NBA:

We've enjoyed a strong partnership with the NBA for almost four decades. We're in continuing conversations with them now, and we're hopeful that we'll be able to reach an agreement that makes sense for both sides.

We've had a lot of time to prepare for this negotiation, and we have strategies in place for the various potential outcomes. However, now is not the time to discuss any of this. Since we are in active negotiations with the league and under our current deal with the NBA, we have matching rights that allow us to match third-party offers before the NBA enters into an agreement with them. With that in mind, please understand that this is as much as we're prepared to say about this topic today.

65.    Also during the call, Defendant Wiedenfels highlighted that WBD "continued [to] benefit from [*inter alia*] the [Company's] many initiatives to improve working capital, which we are still in the early innings of realizing," had a "more disciplined and analytical approach to content investment and allocation," and presented "meaningfully lower cash restructuring costs."

66.    Defendant Wiedenfels also discussed the Company's advertising trends, stating in relevant part that, "we did see sequential improvement [in] linear [markets] . . . in the first quarter" and "[t]otal company advertising in Q1 was down 7%, a sequential improvement of 300 basis points." Defendant Wiedenfels also stressed that the Company expected "another record quarter in Q2", which, "in part, reflects an increasingly more holistic portfolio approach to monetizing viewership on [*inter alia*] linear . . . , supporting our ability to offer our partners incremental reach and more customized ad solutions spanning all platforms, particularly in the US."

67.    During the call, the following exchange occurred between an analyst and Defendants Zaslav and Wiedenfels:

**Analyst—**[T]he last two years, as you well know, you've gone through restructuring while navigating through the massive industry changes. And as you look out over the next two years, and you said there would be some—the industry would restructure. But from a WBD point of view, what do you think the biggest surprises will be? How different will the company look?

And then secondly, next week at the upfront, as we all know, can you give us your outlook for both sides, both direct-to-consumer and linear?

*        *        *

**Defendant Zaslav**—[F]or us, it's really two tiers. One is we got rid of a lot of content we didn't think was going to help us. But at the same time, we brought in a lot of great creatives and invested a lot of content. So it's, how do we run these businesses efficiently for real free cash flow and drive for growth? But two, creative excellence. How do we have the best content?

In this past year, HBO had maybe its best year ever, and in addition to that, Warner Brothers Television has some of the best, highest quality TV production, and we're looking at our motion picture business now, which we're feeling really good about. It's number one to start the year, but we have a lot of great content. So I think it's that combination.

Great content, great creatives, fighting to tell the best stories on every platform, and then running it like a real business. Real free cash flow and real EBIT [earnings before interest and taxes], and I think those two will drive us for the future.

*        *        *

**Defendant Wiedenfels**—I would . . . say that we're operating in a much more constructive environment this year than we did last year. So hopefully, that'll be supportive.

To your point . . . about the differentiation between D2C and linear, well really one of the things that's working very well right now is that convergence. The way . . . the team take our inventory to the market is fully harmonized now. It's across platforms, incremental reach. We're leaning in further.

*        *        *

Longer term, there is definitely more opportunity here. We have been very transparent about the significant monetization difference between linear and digital advertising. [Defendant Zaslav] talked about AI a couple of minutes ago. Certainly that should be a helper longer term as we think about our go-to-market here, so definitely some upside.

*        *        *

We're seeing how we're running the company fundamentally differently that's not reflected in our current and near-term financials, and I think that's going to be the surprises.

68.    Also on May 9, 2024, the Company filed its first quarter report on Form 10-Q with the SEC, for the quarter ended March 31, 2024. Quarterly Report, Warner Bros. Discovery, Inc. (Form 10-Q) (May 9, 2024) (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants

Zaslav and Wiedenfels, who each also provided certifications pursuant to the Sarbanes-Oxley Act of 2022.

69.    In relevant part, the Q1 2024 10-Q stated the following with respect to the Company's goodwill and intangible assets impairment analysis for the quarter:

**NOTE 2.  GOODWILL AND INTANGIBLE ASSETS**

During the three months ended March 31, 2024, the Company performed goodwill and intangible assets impairment monitoring procedures for all of its reporting units and identified no indicators of impairment or triggering events.  As of October 1, 2023 . . . the Networks reporting unit, which had headroom of 5%, . . . had fair value in excess of carrying value of less than 20%.  The Company will continue to monitor its reporting units for triggers that could impact recoverability of goodwill. These triggers include, but are not limited to, continued decline in the Company's market capitalization; affiliate and sports rights renewals, including the NBA, associated with the Company's Networks and DTC reporting units; [and] declining levels of global GDP growth and soft advertising markets in the U.S. associated with the Company's Networks reporting unit[.]

70.    The Q1 2024 10-Q included substantially the same boilerplate purported risk warnings as stated in the 2023 10-K, *supra* ¶ 55, regarding WBD's investment of "significant resources to acquire and maintain licenses to produce sports programming" and that the Company could not make assurances of continued "successful efforts  that "there can be no assurance that we will continue to be successful in our efforts to obtain or maintain licenses to recurring sports events or recoup our investment when the content is distributed."  Nonetheless, the Q1 2024 10-Q acknowledged that "our license for NBA programming is currently subject to renewal, and our exclusivity period with the NBA has expired" and, "[a]s a result, we face increased competition to license content from the NBA, which ***could*** result in significantly higher programming costs to us or a failure to maintain our license for NBA programming."

71.    The Q1 2024 10-Q also contained boilerplate purported risk warnings regarding WBD's recognition of impairment charges related to goodwill and other intangible assets:

We have a significant amount of goodwill and other intangible assets on our consolidated balance sheets. In accordance with U.S. GAAP, management periodically assesses these assets to determine if they are impaired. . . . The occurrence of certain events or circumstances *could* result in a downward revision in the estimated fair value of a reporting unit or intangible assets. For example, continued negative industry or economic trends, including the decline of traditional linear television viewership and linear ad revenues, declining levels of global GDP growth and soft advertising markets in the U.S., disruptions to our business, inability to effectively integrate acquired businesses, execution risk associated with anticipated growth in our DTC products, underperformance of our content, failure to renew content licenses and distribution agreements, including affiliate and sports rights renewals (including the NBA), unexpected significant changes or planned changes in use of the assets, including in connection with restructuring initiatives, divestitures and continued decline in our market capitalization *could* negatively affect our estimates of the fair value of our reporting units. When events or changes in circumstances such as this occur, we have needed to, and *may* in the future need to, write-down the value of our goodwill and other intangible assets. *If* we determine that our estimate of the fair value of a reporting unit is below the recorded value of that unit on our balance sheet, we may record a non-cash impairment loss for the goodwill. Any charges relating to the impairment of our goodwill and other intangible assets *could* materially adversely affect our results of operations in the periods recognized.

We consider all current information when determining the need for, or calculating, any impairment loss. However, future changes in events or circumstances, such as a continuation or worsening of the current negative industry and economic trends and the other events and circumstances described above, *could* result in decreases in the fair value of our goodwill and other intangible assets and require us to record additional impairment losses that *could* materially adversely affect our results of operations in the periods recognized.

72.     The Individual Defendants violated, or caused the Company to violate, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), requiring the Company to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The Individual Defendants' failures to disclose, *inter alia*, that WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill, as well as that WBD's goodwill in its Networks Segment had significantly deteriorated to such an extent that the Company was likely to record billions of dollars

in goodwill impairment charges, violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

**The False and Misleading Proxy Statement**

73.     On April 19, 2024, WBD filed a Schedule 14A with the SEC.  Warner Bros. Discovery, Inc., Proxy Statement (Form DEF 14A) (Apr. 19, 2024) (the "2024 Proxy Statement"). The Director Defendants solicited proxies to vote at the annual stockholder meeting via the 2024 Proxy Statement.  The 2024 Proxy Statement contained material misstatements and omissions.

74.     The 2024 Proxy Statement asked WBD stockholders to vote to, among other things, (1) reelect Defendants Chen, Fisher, Gould, Lowe, Malone, Merchant, Price, and Zaslav to the Board for a one year term ending as of the Company's annual meeting of stockholders in fiscal year 2025; (2) ratify the appointment of PricewaterhouseCoopers LLP as WBD's independent registered public accounting firm for the fiscal year ending December 31, 2024; and (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, commonly referred to as "say-on-pay."

75.     The 2024 Proxy Statement stated that WBD had adopted a Code of Ethics applicable to all representatives of WBD, including directors and officers.

76.     Under the heading Board Role in Risk Oversight, the 2024 Proxy Statement states:

> The Board has overall responsibility for overseeing risk management at WBD and has delegated functional oversight for certain risks to each of the three standing Board committees, as highlighted in the chart below.  While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed about such risks through committee reports and other presentations.  Senior management is responsible for developing and implementing the Company's financial and strategic plans and identifying, evaluating, managing, and mitigating the risks inherent in those plans.  Our Board is responsible for overseeing those plans, the associated risks, and the steps that senior management is taking to manage and mitigate risks.

During 2023, in order to assess key risks, challenges and opportunities, we developed a customized enterprise risk management program, which considers financial, operational, regulatory, reputational, extended enterprise, strategic, technological and talent risks. The Audit Committee oversees the enterprise risk management program. Our Chief Audit and Risk Officer primarily leads the development and assessment of enterprise risk management processes and policies, including identifying, assessing, and reporting on risks. Our Chief Audit and Risk Officer and other members of our senior management provide updates to the Audit Committee on the enterprise risk management program.

77.    The 2024 Proxy Statement, however, failed to disclose that the Company lacked sufficient controls, none of the Board committees were adequately overseeing or charged with overseeing compliance with Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and the Company was overstating its overall business and financial prospects.

78.    The 2024 Proxy Statement also was false and misleading in that it failed to disclose that: (1) the Company lacked sufficient controls, including with respect to financial reporting; (2) contrary to the 2024 Proxy's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements and violate Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), and thus the Director Defendants breached their fiduciary duties; and (3) the Director Defendants who breached their fiduciary duties were improperly interested in increasing their unjust compensation.

79.    The 2024 Proxy Statement was materially misleading because it failed to disclose that: (i) although WBD claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants were violating the Code of Ethics; (ii) contrary to the 2024 Proxy Statement's descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting WBD to issue false and misleading statements; and (iii) the Individual Defendants used "pay-for-

performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

80.     The 2024 Proxy Statement was also materially misleading because it concealed that the ongoing NBA media rights negotiations were compelling, or were reasonably likely to compel, WBD to undertake a substantial reassessment of its business operations and goodwill valuations; withheld from investors that the Networks segment's goodwill had experienced significant deterioration due to multiple factors: the substantial gap between the Company's market capitalization and book value, ongoing weakness across U.S. advertising markets, and mounting uncertainty surrounding both affiliate relationships and sports rights renewals, particularly concerning the NBA contract; these undisclosed conditions substantially elevated the probability that WBD would need to record goodwill impairment charges amounting to billions of dollars.  As a direct consequence of these concealed circumstances, the Individual Defendants presented an artificially inflated and misleading picture of WBD's business outlook and financial health. Consequently, the Individual Defendants caused WBD to issue public statements that were materially false and misleading throughout the Relevant Period.

**Investors Learn the Truth**

81.     On August 7, 2024, the Company issued a press release announcing its second quarter 2024 financial results reporting disappointing revenue of $9.71 billion, marking a 6.3% year-over-year decrease.  Press Release, Warner Bros. Discovery, Inc., *Warner Bros. Discovery, Inc. Reports Second Quarter 2024 Earnings Results* (Aug. 7, 2024) (the "August 7, 2024 PR").  In the August 7, 2024 PR, WBD reported a substantial net loss of approximately $10 billion, which was primarily attributed to a $9.1 billion non-cash goodwill impairment charge from its Networks Segment and $2.1 billion in other one-time accounting effects.  Specifically, the August 7, 2024 Press Release stated, in relevant part:

Net loss available to [WBD] was $(10.0) billion, which includes a $9.1 billion noncash goodwill impairment charge from the Networks segment, as well as $2.1 billion of pre-tax acquisition-related amortization of intangibles, content fair value step-up, and restructuring expenses.

- The goodwill impairment was triggered in response to the difference between market capitalization and book value, continued softness in the U.S. linear advertising market, and uncertainty related to affiliate and sports rights renewals, including the NBA.

82.    During the related earnings call, Defendant Wiedenfels admitted that discussions with the NBA were a "triggering event" that impaired the WBD's goodwill.  He stated, in relevant part:

Little more color on the Goodwill impairment.  And to get straight to the point here, there is no one factor that is driving this impairment.  So the way this works is obviously with the amount of goodwill that we have, there's a systematic process that we go through every quarter and we're monitoring for so-called triggering events.

***And this is clearly where a sports right discussion like the one with the NBA comes into play as a triggering event, which then compels us to re-evaluate our business case*** in a strategic planning process with the latest assumptions, the best view of where the industry is and how we play in that field.  ***And that's what then leads to evaluation, which in the second quarter happened to be $9.1 billion below what was on the books for the network segment.***  So it's really a full re-evaluation, not a response to one individual factor.

83.    On this news, the price of WBD's stock fell $0.69 per share, or 8.95%, to close at $7.02 per share on August 8, 2024.

## AN INVESTOR FILES THE SECURITIES CLASS ACTION

84.    On November 25, 2024, a purported purchaser of Company stock filed the Securities Class Action in the United States District Court for the Southern District of New York against WBD and Defendants Zaslav and Wiedenfels.  The Securities Class Action alleges that throughout the class period of February 23, 2024 to August 7, 2024, defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Securities Class Action alleges that

defendants failed to disclose to investors that (i) WBD's sports rights negotiations with the NBA were causing, or were likely to cause, the Company to significantly reevaluate its business and goodwill; (ii) WBD's goodwill in its Networks Segment had significantly deteriorated as a result of the difference between its market capitalization and book value, continued softness in certain U.S. advertising markets, and uncertainty related to affiliate and sports rights renewals, including with the NBA; (iii) the foregoing significantly increased the likelihood of WBD incurring billions of dollars in goodwill impairment charges; (iv) accordingly, defendants had overstated WBD's overall business and financial prospects; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO WBD

85.    As a result of the Individual Defendants' improprieties, WBD disseminated improper public statements concerning WBD's operations, prospects, and internal controls.

86.    As a direct and proximate result of the Individual Defendants' misconduct, WBD has lost and expended, and will lose and expend, millions of dollars.

87.    The Securities Class Action has exposed the Company to massive class-wide liability.  As a direct and proximate result of the Individual Defendants' actions, WBD has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

88.    As a direct and proximate result of the Individual Defendants' actions as alleged above, WBD's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

89.    The actions of the Individual Defendants have irreparably damaged WBD's corporate image and goodwill.  For at least the foreseeable future, WBD will suffer from what is

known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that WBD's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

90.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

91.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

92.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained here because the action described herein occurred under the authority and approval of the Board.

93.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

94.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and WBD and was at all times acting within the course and scope of such agency.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

96.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

97.    Plaintiff is an owner of WBD common stock and has been an owner of WBD common stock since the wrongdoing alleged herein.

98.    Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**Demand Is Futile Because Each Member of the
Board Faces a Substantial Likelihood of Personal Liability**

99.    At the time Plaintiff commenced this action, the Board consisted of twelve directors, including Director Defendants Chen, Di Piazza, Fisher, Gould, Lee, Lowe, Malone, Merchant, Price, Yang, and Zaslav and non-party Daniel Sanchez ("Sanchez").  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

100.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning WBD's business, operations, prospects, internal controls, and financial statements.

101.    Moreover, the Director Defendants owed and owe a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

102.    The Director Defendants also approved the 2024 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

103.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

104.    If the Director Defendants were to bring a suit on behalf of WBD to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiff making a demand would have be futile.

**The Audit Committee Defendants Face an**
**Even Greater Likelihood of Personal Liability**

105.    The Audit Committee Defendants (Di Piazza, Lowe, Merchant, and Price), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**Defendant Zaslav Lacks Independence**

106.    Defendant Zaslav is not an independent director because his principal occupation is CEO and President of WBD.  Indeed, the Company's 2024 Proxy Statement states that Zaslav is not an independent director.

107.    Moreover, Defendant Zaslav's daughter was employed by the Company as a producer for CNN.  Therefore, Defendant Zaslav cannot consider a demand against the Board which could adversely impact his daughter and her livelihood.

108.    In addition, Defendant Zaslav is a named defendant in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of

the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act. If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Zaslav's willful and/or reckless violations of his obligations as CEO and director of WBD. Hence, Defendant Zaslav is incapable of considering a demand to commence and vigorously prosecute this action because he faces an even greater likelihood of personal liability than the rest of the Individual Defendants.

**Defendants Di Piazza, Fisher, Gould, Lee, Malone, and Yang Lack Independence**

109.    Defendant Di Piazza served as a member of the board of directors of AT&T, Inc. ("AT&T") from 2015 to 2022. Defendant Fisher served as a member of the board of directors of AT&T from 2015 to 2021. Defendant Lee served as a member of the board of AT&T from 2019 to 2022. Defendant Yang served as a member of the board of directors of AT&T from 2016 to 2022. Defendants Di Piazza's, Fisher's, Lee's, and Yang's time on the Board of AT&T overlapped, creating a strong personal and business relationship between and among them. Thus, they could not exercise independent business judgment in considering a demand to investigate and prosecute this action.

110.    Defendant Lee also lacks independence because the Company hired her daughter as a writer for a television program produced by Warner Bros. Television during 2023. As such, Defendant Lee is conflicted and could not reasonably consider a demand which could have an adverse impact on her daughter or her daughter's livelihood.

111.    Defendant Gould has served as a member of the board of directors of Liberty Latin America, Ltd. ("Liberty LATAM") since 2017 and as a member of the board of directors of Liberty Global Ltd. ("Liberty Global") since 2005. He also served as a member of the board of directors of Discovery Holding Company ("Discovery Holding") from 2005 to 2008, when it merged with Discovery.

112.    Defendant Malone has served as a member of the board of directors of Liberty LATAM from 2017 to 2019 and of Liberty Global since 2005.  Malone also served as CEO and Chairman of the Board of Discovery Holding from 2005 to 2008, when it merged with Discovery. Defendants Gould and Malone have a longstanding personal and business relationship, and thus, they cannot exercise independent business judgment in considering a demand to investigate and prosecute this action.

113.    Defendant Zaslav previously served as President of Discovery from 2006 to 2022. Zaslav's, Gould's, and Malone's time at Discovery overlapped, and thus, they are conflicted because they have a longstanding personal and business relationship.  Defendants Zaslav, Gould, and Malone cannot exercise independent business judgment to consider a demand to prosecute this action.  Demand is futile against each of them.

114.    Defendant Malone has also served as a member of the boards of Liberty Media Corporation ("Liberty Media") and its predecessors since 2010 and Liberty Broadband Corporation since 2014.  Defendant Yang served as a member of the board of directors of Liberty Media Acquisition Corporation, a special purpose acquisition company and indirect wholly owned subsidiary of Liberty Media, from 2021 to 2022.   Defendants Malone and Yang have a longstanding personal and business relationship thus, they cannot exercise independent business judgment in considering a demand to investigate and prosecute this action.

**Non-Party Sanchez Lacks Independence**

115.    Non-party Sanchez has been a director of the Company since October 2024. However, Sanchez has served on the board of directors of Liberty LATAM since 2019 and of Liberty Global since 2022.  Gould and Malone also served on the board of directors of Liberty LATAM and Liberty Global, and thus, Sanchez is conflicted and not independent to consider a demand against the Board.

**FIRST CAUSE OF ACTION**
<u>**Against the Individual Defendants for Breach of Fiduciary Duties**</u>

116.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

117.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of WBD's business and affairs.

118.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

119.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of WBD.

120.    In breach of their fiduciary duties owed to WBD, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) the impact of NBA rights negotiations on the Company's business evaluation and goodwill; (ii) the deteriorating condition of the Networks Segment's goodwill; (iii) the likelihood of significant goodwill impairment charges; and (iv) the Company's overall business prospects and financial condition.

121.    Accordingly, WBD's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby causing the stock to trade at artificially inflated prices.

122.    The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of

material fact referenced herein, thereby, rendering themselves personally liable to the Company for breaching their fiduciary duties.

123.    The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

124.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

125.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.  The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

126.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, WBD has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CAUSE OF ACTION**
**Against the Securities Class Action Defendants**
**for Contribution under Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5**

128.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

129.    WBD and Defendants Wiedenfels and Zaslav are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of WBD.

130.    Because of their positions of control and authority as officers and/or directors of WBD, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of WBD, including the wrongful acts complained of herein and in the Securities Class Action.

131.    Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which create an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

132.    As such, WBD is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

### THIRD CAUSE OF ACTION
### Against the Individual Defendants for
### Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

134.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

135.    The 2024 Proxy Statement violated Section 14(a) and Rule 14a-9 because it solicited WBD stockholder votes for, *inter alia*, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's shortcomings in connection with the ongoing NBA media rights negotiations were compelling, or were reasonably likely to compel, WBD to undertake a substantial reassessment of its business operations and goodwill valuations; withheld from investors that the Networks Segment's goodwill had experienced significant deterioration due to multiple factors: the substantial gap between the Company's market capitalization and book value, ongoing weakness across U.S. advertising markets, and mounting uncertainty surrounding both affiliate relationships and sports rights renewals, particularly concerning the NBA contract. These undisclosed conditions substantially elevated the probability that WBD would need to record goodwill impairment charges amounting to billions of dollars. As a direct consequence of these concealed circumstances, the Individual Defendants presented an artificially inflated and misleading picture of WBD's business outlook and financial health.

Consequently, the Individual Defendants caused WBD to issue public statements that were materially false and misleading throughout the Relevant Period.

136.    The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9.  By virtue of their positions within the Company and roles in the process and in the preparation of the 2024 Proxy Statement, the Individual Defendants were aware of this information and of their duty to disclose this information in the 2024 Proxy Statement.

137.    The Individual Defendants knew that the statements contained in the 2024 Proxy Statement were materially false and misleading.

138.    The omissions and false and misleading statements in the 2024 Proxy Statement are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors.  Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the 2024 Proxy Statement and in other information reasonably available to stockholders.

139.    As a direct and proximate result of the dissemination of the false and misleading 2024 Proxy Statement that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant WBD suffered damage and actual economic losses (*i.e.*, wrongful re-election of directors) in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Against the Individual Defendants for Unjust Enrichment

140.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

141.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, WBD.

142.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from WBD that was tied to the performance or artificially inflated valuation of WBD, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

143.    Plaintiff, as a stockholder and representative of WBD, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

144.    Plaintiff, on behalf of WBD, has no adequate remedy at law.

## FIFTH CAUSE OF ACTION
### Against the Individual Defendants for Aiding and Abetting

145.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

146.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to WBD and has participated in a conspiracy in breach of fiduciary duties.

147.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or

design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

148.    The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

149.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

150.    Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

151.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of WBD and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Awarding prejudgment interest to the Company;

D.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  January 14, 2025                    Respectfully submitted,

                                            BRAGAR EAGEL & SQUIRE, P.C.

                                            */s /J. Brandon Walker*
                                            J. Brandon Walker (Bar No. JW0506)
                                            Melissa A. Fortunato (Bar No. MF0214)
                                            Gabriela Alejandra Cardé (Bar No. 5763156)
                                            810 Seventh Avenue, Suite 620
                                            New York, New York 10019
                                            Tel:  (212) 308-5858
                                            Fax:  (212) 308-5857
                                            Email: walker@bespc.com
                                                     fortunato@bespc.com
                                                     carde@bespc.com

                                            *Attorneys for Plaintiff Lewis Herman, III,*
                                            *derivatively on behalf of Warner Bros.*
                                            *Discovery, Inc.*

**VERIFICATION**

I, Louis Herman III, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of Warner Bros. Discovery, Inc., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true. I further declare that I am a current holder of Warner Bros. Discovery, Inc. stock and have continuously held Warner Bros. Discovery, Inc. stock from the time of the wrongdoing alleged herein until the present. I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___13th___ day of January 2025.

*Louis Herman III*

Louis Herman III (Jan 13, 2025 12:51 MST)

Louis Herman III